# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-cv-61666-RKA

**DON SMITH**, *et al.*,

    *Appellants*,

*v.*

**SONYA S. SLOTT**,

    *Appellee.*

_____/

## <u>ORDER AFFIRMING BANKRUPTCY COURT</u>

Our Appellants, the Smith-Related Entities,[1] challenge the Bankruptcy Court's Order, which approved a settlement between Sonya S. Slott (the "Trustee") and Green Tech Development, LLC ("Green Tech"), a creditor of the bankruptcy estate. *See In re: No Rust Rebar, Inc.*, Case No. 21-12188-PDR (the "Bankruptcy Case") [Bankr. ECF No. 327].[2] In approving that settlement (Appellants claim), the Bankruptcy Court violated several substantive and procedural requirements of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Code"). Having carefully examined the briefs and the record—and for the reasons outlined below—we now **AFFIRM** the Bankruptcy Court's Order in full.[3]

---

[1] What we call the "Smith-Related Entities" are actually the following group of individuals and entities: (1) Don Smith; (2) Global Energy Sciences, LLC; (3) Raw Energy Materials, Corp.; and (4) Yellow Turtle Design, LLC.

[2] We refer to the docket in the Bankruptcy Case as "Bankr. ECF No."

[3] Neither party requested oral argument. And, after carefully reviewing the briefs and the record, we agree that any such argument would have been unnecessary because the parties have adequately presented the facts and legal arguments in their papers. *See* FED. R. BANKR. P. 8019(b)(3).

THE FACTS[4]

I.      **No Rust Rebar, Inc., faces financial difficulties**

Don Smith is "the president of No Rust Rebar, Inc.," the debtor in this case. *See* Chapter 11 Subchapter V Voluntary Petition ("Chapter 11 Petition") [Bankr. ECF No. 1] at 6. Smith founded the company in 2015 "to manufacture and sell basalt-based reinforcing bars" that "do not rust." *See* Debtor's Plan of Reorganization or Liquidation ("Debtor's Plan") [Bankr. ECF No. 56] at 1. Because No Rust "needed to secure a manufacturing facility," Smith contracted to buy a "foreclosed industrial facility . . . for $450,000 and paid a non-refundable $50,000 deposit." Order Converting Case to Chapter 7 ("Conversion Order") [ECF 13-2] at 5. Unfortunately, when the financing for the purchase fell apart, No Rust had to change course. *See id.* at 5 ("Without additional investment . . . No Rust lacked the funds to close and risked losing both the Property and its $50,000 deposit."). And that alternative course is what led the parties to this bankruptcy litigation.

Because No Rust didn't have the funds to close, it "agreed to assign its right to purchase the Property" to another company, Green Tech Development, LLC ("Green Tech"), which went ahead and bought the property. *Ibid.* No Rust would later contend that "consideration for the assignment included an option to purchase the Property [back] from Green Tech." *Id.* at 6. But the record reveals "no signed written agreement memorializing the purported option." *Ibid.* So, when "Smith sought to exercise No Rust's purported option[,] . . . Green Tech refused to sell." *Id.* at 7. No Rust then sued Green Tech for specific performance in state court (the "Property Dispute"), *see* Notice of Removal of Civil Action [Bankr. ECF No. 25], and filed a *lis pendens* against the Property—as a condition of

---

[4] These facts are taken from the Bankruptcy Case filings ["Bankr. ECF"] and the Bankruptcy Case record. *See* Bankruptcy Transmittal of Bankruptcy Appeal [ECF No. 13]. The record was transmitted in two parts: (1) the Appellant's Designation of the Items to be Included in the Record on Appeal [ECF No. 13-1] ("Bankr. R."); and (2) the Appellee's Designation of Additional Items for Record on Appeal [ECF No. 13-2] ("Bankr. Supp. R.").

which it posted a $300,000 bond (the "Cash Bond"), *see* Trustee Sonya S. Slott's Motion to Approve Stipulation to Compromise Controversy ("Motion to Approve Compromise") [ECF No. 13-1] at 36 ("[T]he Debtor had posted a cash bond in th[e] state court case as a condition for maintaining a Lis Pendens on the Pompano Beach Property in favor of Green Tech in the amount of $300,000.00."). Green Tech separately responded by suing No Rust (also in state court) for ejectment and civil trespass. *See* Notice of Removal of Civil Action [Bankr. ECF No. 26].

But that was just the beginning of No Rust's problems. In 2019, the electric company cut off the Property's power for reasons that aren't relevant here. *See* Conversion Order at 8. Rather than lease some other property, though, No Rust continued to try to operate its business on the Property— with a generator that provided only intermittent power. *See id.* at 8–9 ("[A] generator has provided some power. . . . No Rust could have chosen to lease another Property. . . . [But] Smith testified, in his business judgment, that was too expensive and not in No Rust's best interests.").

Finally, in March 2021, No Rust filed a voluntary bankruptcy petition to reorganize its business under Subchapter V of Chapter 11 of the Bankruptcy Code. *See* Chapter 11 Petition at 1–2. Smith continued running No Rust—now the "Debtor-in-Possession," which was "allowed to remain in full operation of its business and to manage its property." Order Authorizing Debtor in Possession to Continue Operation of its Business [Bankr. ECF No. 8] at 1.

## II.     No Rust tries to reorganize but is forced to liquidate

In the Bankruptcy Case, Green Tech filed a "Proof of Claim," averring that, because of the ongoing property dispute, No Rust owed it $1,948,339 in damages. *See* Green Tech Proof of Claim [ECF No. 13-1] at 102–03 (reflecting a $1,948,339 claim for "'[d]amages resulting from a Lis Pendens and occupying property"). Green Tech's claim was partially secured by the $300,000 cash bond. *See id.* at 103 (noting that "[t]he claim is secured by a lien on the property" of "300,000" and describing the lien as the "bond posted"). The remaining $1,648,339 of the claim was unsecured. *Ibid.* ("Amount of

3

the claim that is unsecured: $1,648,339.00"). Green Tech reserved the right to amend its claim and "to file an administrative claim." *Id.* at 106. No Rust objected and asked the Bankruptcy Court to strike the proof of claim because, if No Rust were to "prevail in [the Property Dispute]," the "claim w[ould] be zero." *See* Objection to Claim [Bankr. ECF No. 123] at 1. Green Tech responded by noting that it had filed its "conditional claim" at the "court's direction." Response to Objection to Claim [Bankr. ECF No. 150] ¶ 3.

After No Rust removed the Property Dispute to the Bankruptcy Court, *see* Notice of Removal [Bankr. ECF No. 25], the Bankruptcy Court denied both sides' summary-judgment motions, *see* Order Denying Motions for Summary Judgment [ECF No. 31-1] at 276 ("Both parties seek summary judgment, but genuine disputes as to material facts persist. Consequently, the Court denies both motions."). And No Rust's reorganization "plan" made clear that, "[i]f [No Rust] is not successful in the pending litigation . . . this case will be converted to a Chapter 7 liquidation." Debtor's Plan at 2.

But, before the Bankruptcy Court could adjudicate the case on its merits, Green Tech moved for the Subchapter V Trustee to take control of the bankruptcy estate. *See* Motion for Removal of Debtor as Debtor in Possession ("Motion for Removal") [Bankr. ECF No. 70]. Green Tech alleged that Smith had engaged in "Fraud," "Dishonesty," "Multiple, Incurable Conflicts of Interest," and "Gross Mismanagement." *See id.* at 1–2. Soon after, Green Tech moved, in the alternative, to convert the case to a Chapter 7 liquidation—alleging (again) problems with Smith's control of the bankruptcy estate. *See generally* Motion to Convert to Chapter 7 ("Motion to Convert") [Bankr. ECF No. 116]. One of the issues Green Tech identified was that "Smith [had] transferred recoverable assets of the Debtor to the Smith [Related] Entities [and] also to his partner Elina Jenkins and her [b]usiness[,] Yellow Turtle Designs, LLC." *Id.* at 2. A Chapter 7 trustee was needed, Green Tech argued, because "the Debtor[, under Smith's control, was] conflicted and unwilling to recover the assets of the Debtor transferred to [these entities]." *Ibid.* In Green Tech's view, then, a Chapter 7 liquidation would be "in

the best interests of creditors and the estate." *Id.* at 6. After four days of evidentiary hearings on these (and other related) motions, *see* Conversion Order at 13 (noting that the court held evidentiary hearings on December 8, 2021, December 21, 2021, January 4, 2022, and January 10, 2022), the Bankruptcy Court converted the case to a Chapter 7 liquidation, *see* Conversion Order at 34 ("This case is CONVERTED to a Chapter 7 case.").

In its Conversion Order, the Bankruptcy Court concluded that Smith had, in fact, mismanaged the estate. *See generally* Conversion Order.[5] So, for instance, the Bankruptcy Court found that Smith had commingled No Rust's assets and liabilities with his own in a giant asset soup he called "the Family." *Id.* at 21 ("[T]he Family appears to have been a group of commingled entities whose responsibilities, assets, and liabilities were constantly shuffled to fit Smith's needs or whims."). And, the court continued, while these business practices "demand[ed] an investigation into whether the estate ha[d] an interest in any . . . assets of the other Family members," Smith could *not* be trusted to run that investigation. *Id.* at 25 ("Left in control, Smith, as the principal of No Rust, would have to investigate and, if necessary, sue himself and his own entities. Clearly this is an incurable conflict of interest.").

Moreover, because No Rust's reorganization plan "[was] not feasible," *id.* at 27, its assets would need to be liquidated—a process "best . . . accomplished through a Chapter 7," *id.* at 34. At the time, after all, No Rust was "not operating," *id.* at 26, and it was relying entirely on the possibility that it might one day "prevail in the Property Dispute," *id.* at 27 ("Here, the only means provided for the Plan's implementation require that No Rust prevail in the Property Dispute."). But a No Rust victory

---

[5] Because the Conversion Order was never appealed, we accept its findings as true. *See In re Cummings*, 381 B.R. 810, 823 (S.D. Fla. 2007) (Gold, J.) (explaining that, under the "law of the case doctrine," "the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal" and noting that the "doctrine applies to lower court rulings that have not been challenged on appeal" (cleaned up)).

(the court explained) was "not reasonably likely" because No Rust faced "an undeniably high burden." *Id.* at 28. For one thing, its specific-performance claim required "prov[ing] the contract . . . by competent and satisfactory proof which must be clear, definite and certain." *Id.* at 27. For another, "[t]o take the [oral-option] contract out of the statute of frauds under the partial performance exception," No Rust would have to satisfy a multipronged test. *Ibid.* Even if No Rust could overcome these obstacles, it would then have to "prov[e] that it strictly complied with the applicable provisions of the contract and was ready, willing, and able to perform under the contract at the time it exercised the Option." *Id.* at 27–28. At the end of the day, "No Rust [was] an entity that, at best, h[eld] an interest in a single piece of real estate, lack[ed] any real production facility, and ha[d] failed to provide a 'viable solution' to becoming an operational business." *Id.* at 33.

### III.    The Trustee and Green Tech agree to a compromise and seek court approval

Once Sonya S. Slott was appointed as the estate's Chapter 7 trustee, *see* Notice of Appointment of Trustee [Bankr. ECF No. 195], she "and Green Tech began settlement discussions, which continued over several weeks," *see* Trustee Sonya S. Slott's Motion to Approve Stipulation to Compromise Controversy Between Trustee and Green Tech Development, LLC ("Motion to Approve Compromise") [ECF No. 13-1] at 38 ¶ 17. On July 19, 2022, Slott and Green Tech reached a global resolution of their disputes (the "Compromise") and moved for the court's approval. *See generally* Motion to Approve Compromise.

As relevant here, the Compromise outlined the following terms: (1) Green Tech and the estate would mutually dismiss their ongoing litigation, and the Trustee would withdraw her objection to Green Tech's claim, *see* Settlement Agreement and Release [ECF 13–1] at 57–58 ("12. Dismissal of Adversary Proceedings and Withdrawal of Objection with Prejudice: . . . ."); (2) Green Tech and the estate would exchange mutual releases for all *potential* suits and claims, *see id.* at 56 ("11. Mutual Release: . . . ."); (3) Green Tech and the estate would jointly sell their respective interests in the Property with

a total reserve price of $3,000,000 (the "Property Sale"), *id.* at 51 ("4. Special Power of Attorney Recorded in Favor of Trustee," and "5. Marketing and Sale of the Pompano Beach Property: . . . ."); (4) the proceeds of the Property Sale would be shared between Green Tech and the estate in tiers, with different price targets triggering different sharing percentages, *see id.* at 55 ("6. Distribution and Payments from Sale Proceeds: . . . ."); (5) regardless of the Property Sale's outcome, the Cash Bond No Rust had posted would be released to the estate, *see id.* at 54–55 ("7. Absolute Payment of Net Cash Bond to the Estate: . . . ."); (6) "in recognition" of Green Tech's "substantial contribution" to the Chapter 11 phase of the case, which "materially advanced" the estate's litigation prospects against No Rust's affiliates and "insiders" for improper transfers of estate assets (the "Insider Litigation"), Green Tech would receive 33% of the recovery from any such future litigation (the "Litigation Sharing Provision"), *see id.* at 55 ("9. Sharing in Recoveries from Certain Litigation Brought by the Estate: . . . ."); and (7) "[i]n consideration of the general terms of the settlement," Green Tech would be granted a "non-priority general unsecured claim" of "$2,500,000," *id.* at 56 ("10. General Unsecured Claim in Favor of Green Tech: . . . .").

## IV.     The Bankruptcy Court approves the Compromise

The Bankruptcy Court set the Motion to Approve Compromise—and some related filings—for a hearing on August 17, 2022 (the "Settlement Approval Hearing"). *See* Notice of Hearing [ECF No. 13-1] at 64. The Smith-Related Entities filed *eight* objections to the Compromise. *See* Objections to Motion to Compromise [ECF No. 13-1] at 66–67. They also submitted a "counterproposal" for the trustee to adopt in lieu of the Compromise. *See id.* at 68–69. The counterproposal (in relevant part) offered the Trustee $200,000 in exchange for an assignment of (1) the estate's claims in the Property Dispute and (2) any potential claims against No Rust's affiliates and insiders. *See ibid.*

The Bankruptcy Court heard from all parties at the Settlement Approval Hearing. *See* August 17, 2022, Hearing Transcript ("Aug. 17 Hr'g Tr.") [ECF No. 19-1] at 24[6]:4–15 (noting that, "with respect to the motion to compromise controversy," the court would "hear from the trustee's counsel, and then to hear from any others supporting the settlement, and then [ ] would turn the podium over to the objecting parties"). After an extensive colloquy with counsel for all the interested parties, the court overruled all but one of the Smith-Related Entities' objections. *See id.* at 98:15–18 ("The Court: . . . Right now what I'm finding . . . is that the settlement agreement is otherwise approvable."). With respect to that one objection, the court echoed Smith's concern that the Litigation Sharing Provision would pay Green Tech funds from the estate ahead of other creditors in violation of the Code's priority scheme. *See* Aug. 17 Hr'g Tr. at 97:13–18 ("The Court: Okay, and when the estate pays 33 percent off the top to Green Tech in consideration for what is now a subordinated substantial contribution claim, it is not following the 726 priority scheme, correct, because they're getting 33 percent off the top. Am I missing something there?"). Given the court's concern, the Trustee and Green Tech agreed to sever that provision from the Compromise. *Id.* at 99:12–24 ("Mr. Malnik [Trustee's counsel]: . . . . I believe we can proceed with this deal and just sever this provision. It, to be quite frank, may not be worth the Court's or the trustee's headache approving this given your Honor's concern at this point.").

After the hearing, the Bankruptcy Court approved the Compromise, *see* Order Granting Trustee Sonya S. Slott's Motion to Approve Stipulation to Compromise [ECF No. 13-1] at 75, and later set forth its reasons in a separate order, *see* Memorandum Opinion on Order Granting Motion to Compromise Controversy (the "Mem. Op.") [ECF No. 13-1] at 79. The Smith-Related Entities timely appealed that order.

---

[6] We refer here *not* to the page number of the transcript itself, *but* to the page in the Bankruptcy Court's record where the transcript appears.

## THE LAW

District courts have "jurisdiction to hear appeals from final judgments, orders, and decrees . . . of bankruptcy judges." *In re Charter Co.*, 778 F.2d 617, 621 (11th Cir. 1985) (quoting 28 U.S.C. § 158(a)). "In reviewing bankruptcy court judgments, a district court functions as an appellate court. It reviews the bankruptcy court's legal conclusions *de novo*, but must accept the bankruptcy court's factual findings unless they are clearly erroneous." *In re JLJ Inc.*, 988 F.2d 1112, 1116 (11th Cir. 1993); *see also In re Gaddy*, 851 F. App'x 996, 999 (11th Cir. 2021) ("A bankruptcy court abuses its discretion when it either misapplies the law or bases its decision on factual findings that are clearly erroneous."). "*De novo* review requires the court to make a judgment independent of the bankruptcy court's, without deference to that court's analysis and conclusions." *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295 (11th Cir. 2001). And "[t]he bankruptcy court's findings of fact are not clearly erroneous unless, in light of all the evidence, we are left with the definite and firm conviction that a mistake has been made." *In re Int'l Pharm. & Disc. II, Inc.*, 443 F.3d 767, 770 (11th Cir. 2005); *see also In re Gaddy*, 851 F. App'x at 999 ("A factual finding is not clearly erroneous unless, after reviewing all of the evidence, we are left with a definite and firm conviction that a mistake has been committed."). Finally, we "review the bankruptcy court's approval of a settlement agreement under an abuse of discretion standard." *In re Chira*, 567 F.3d 1307, 1311 (11th Cir. 2009). This standard of review is "extremely limited" and "highly deferential." *Aldana v. Del Monte Fresh Produce N.A. Inc.*, 578 F.3d 1283, 1288 (11th Cir. 2009).

## ANALYSIS

The issue in this appeal is whether the Bankruptcy Court abused its discretion by approving the Compromise. "Under Federal Rule of Bankruptcy Procedure 9019, a bankruptcy court may approve a settlement of controversies on motion by the trustee and after notice and a hearing." *In re Kenny*, 2022 WL 2282843, at *3 (11th Cir. June 23, 2022) (citing FED. R. BANKR. P. 9019(a) (cleaned up)). There is "a strong public policy in favor of settlement," *ibid.*, and a bankruptcy settlement should

be approved so long as it doesn't "fall below the lowest point in the range of reasonableness." *Martin v. Pahiakos (In re Martin)*, 490 F.3d 1272, 1275 (11th Cir. 2007). In considering whether to approve a settlement, bankruptcy courts should analyze four factors:

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990).

Our Appellants don't suggest that the Bankruptcy Court misapplied these *Justice Oaks* factors. *See generally* Initial Br. [ECF No. 21] at 2–11; Reply Br. [ECF No. 23] at 1. They, in fact, *never* mention these factors at all—let alone the cases that analyze them. They've thus forfeited any such argument. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances[.]"); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012), *overruled in part on other grounds by United States v. Durham*, 795 F.3d 1329, 1331 (11th Cir. 2015) (en banc) ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed [forfeited]."). Still, in part III of our analysis, we'll address the Bankruptcy Court's treatment of these factors because it'll help us deal with one of the Appellants' final arguments—*viz.*, that their counterproposal should have been approved instead of the Compromise. *See* Initial Br. at 11 (contending that the Appellants' counterproposal "was rejected in favor of the 'pig in a poke,' which the Bankruptcy Court approved").

First, though, we'll address the crux of the Appellants' position—which is that, by approving the Compromise, the Bankruptcy Court violated several substantive and procedural requirements of the Bankruptcy Code. *Id.* at 5 ("The Bankruptcy Court erred in approving the compromise of

controversy in which the terms of such compromise violate specific provisions of the Bankruptcy Code.").[7] In saying so, the Appellants advance (essentially) four basic points: (1) that the Property Sale was improper under § 363 of the Code, *id.* at 8 ("In another perverse application of the Bankruptcy Code, the Trustee utilized 11 U.S.C. § 363 . . ."; (2) that the Compromise would pay Green Tech estate funds ahead of other creditors, in violation of the Code's prescribed payment scheme, *id.* at 6 ("The approved distribution of proceeds directly contradicts the statutorily prescribed priorities of distribution in 11 U.S.C. §§ 507, 726, in contravention of the clear instructions of the Supreme Court of the United States in *Czyzewski v Jevic Holding Corp* . . . ."); (3) that the Bankruptcy Court erred by refusing to hold an evidentiary hearing or allow discovery, *id.* at 10 ("The Bankruptcy Court erred in approving the Motion without holding an evidentiary hearing, or permitting discovery to be completed prior to closing the hearing."); and (4) that the Appellants' counterproposal was superior to the Compromise, *id.* at 11 ("Where a simpler alternative provides for payment of all legitimate non-insider creditors, that is the proposal which should have been approved."). We address—and reject—each argument in turn.

---

[7] We agree (of course) that, *if* the Compromise had violated the terms of the Bankruptcy Code, then the Bankruptcy Court would've abused its discretion by ratifying that Compromise. *See, e.g., Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law[.]"); *Law v. Siegel*, 571 U.S. 414, 420–21 (2014) ("A bankruptcy court has statutory authority to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. . . . But in exercising those statutory . . . powers, a bankruptcy court may not contravene specific statutory provisions." (cleaned up)); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 471 (2017) (explaining that "courts cannot deviate from the procedures specified by the Code, even when they sincerely believe that creditors would be better off" (cleaned up)).

## I.      The Property Sale complied with § 363

As part of the Compromise, the Trustee plans to sell *both* the estate's *and* Green Tech's interests in the Property. *See* Mem. Op. at 88 ("The Proposed Settlement merely provides that Green Tech and the [e]state will sell their respective interests in the Property together and each will receive agreed upon amounts based on those separate interests."); *see also* Settlement Agreement and Release at 51 ("Green Tech . . . shall execute a special power of attorney in favor of the trustee to act on behalf of Green Tech with respect to the sale of the Pompano Beach Property."). The Appellants claim that the Property Sale violates § 363 of the Bankruptcy Code because no court has declared the validity of the estate's equitable interest in the Property. *See* Initial Br. at 9 ("An asserted equitable interest in real property located in Florida is not an interest in property until or unless a court so holds. Under 363(b)(1), the record does not support a finding of exactly what interest the Debtor held in the subject property.").[8]

That's an odd argument for the Appellants to make since it's been their position—from the very beginning of their dispute with Green Tech—that they hold an ownership interest in the Property. Recall that Smith—who was in control of No Rust at the *start* of the bankruptcy proceedings—listed an equitable interest in the Property as one of the estate's assets. *See* Summary of Assets and Liabilities for Non-Individuals (the "Summary of the Estate's Assets and Liabilities") [Bankr. ECF No. 19] at 7, "Part 9" (listing "equitable interest" under the "[n]ature and extent of debtor's interest in [the Property]" and giving "$1,055,000.00" as the "[c]urrent value of debtor's

---

[8] The Appellants provide no legal authority for this position, *see generally* Initial Br.; Reply Br.—which is reason enough for us to disregard it, *see Campbell*, 26 F.4th at 873; *Hamilton*, 680 F.3d at 1319; *In re Egidi*, 571 F.3d at 1163; and *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (collecting cases for the proposition that "an appellant [forfeits] a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority").

interest"). The estate's equitable interest in the Property is a form of property that *can* be sold under §
363. According to the Bankruptcy Code, "[p]roperty of the estate" includes "all legal or equitable
interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). And
§ 363(b) makes clear that "the Trustee may use, *sell*, or lease . . . property of the estate." 11 U.S.C. §
363(b)(1) (emphasis added); *see also MOAC Mall Holdings LLC v. Transform Holdco LLC*, 143 S. Ct. 927,
932 (2023) ("[T]he Bankruptcy Code permits . . . a trustee[ ] to sell or lease the bankruptcy estate's
property outside of the ordinary course of the bankrupt entity's business." (citing 11 U.S.C. § 363(b))).

Nor does the law support the Appellants' view that the estate's interest in the Property was
somehow ineffectual because it was contingent. *See, e.g.*, *Segal v. Rochelle*, 382 U.S. 375, 379 (1966)
("[T]he term 'property' has been construed most generously and an interest is not outside its reach
because it is novel or contingent or because enjoyment must be postponed."); *United States v. Whiting
Pools, Inc.*, 462 U.S. 198, 204–05 (1983) (noting that "Congress intended a broad range of property to
be included in the estate," including "property in which the debtor did not have a possessory interest
at the time the bankruptcy proceedings commenced"); *In re Berris*, 458 B.R. 601, 610 (Bankr. S.D. Fla.
2011) (Cristol, J.) (noting that the phrase "[a]ll legal or equitable interests" of a debtor "include[s]
legally enforceable rights under state law"). For what it's worth, the Appellants' position would also
undermine the Code's "policy of maximizing the value of the bankruptcy estate." *Toibb v. Radloff*, 501
U.S. 157, 163 (1991). As the Bankruptcy Court correctly recognized, if the estate couldn't sell an
"undetermined" equitable interest, "the [e]state would conceivably retain the right to exercise the
option against the buyer." Mem. Op. at 85. No "buyer would agree to pay fair market value for the
Property under those circumstances." *Ibid.*

If we understand the Appellants correctly, they seem to be thinking of a hypothetical
circumstance in which their claimed equitable intertest in the Property was found to be invalid. In that
circumstance, they point out, the Trustee would have no right to sell the Property. But remember that,

to approve a settlement, a bankruptcy court need only provide "notice and a hearing," FED. R. BANKR. P. 9019(a), and "determine that the settlement does not fall below the lowest point in the range of reasonableness," *In re Kenny*, 2022 WL 2282843, at *3 (quoting *In re Martin*, 490 F.3d at 1275). And, notably, "[i]n evaluating a settlement proposal, a bankruptcy court need not find facts, draw legal conclusions, or otherwise adjudicate the merits of underlying litigation." *Id.* at *5. The whole point of a settlement, in other words, is to avoid the need to fight every potential legal issue to the bitter end. In approving the Compromise, then, the Bankruptcy Court was entitled to *assume* that the Appellants have been right from the beginning—*viz.*, that the estate *does* have an interest in the Property—and to maximize the creditors' return by selling that purported interest (together with Green Tech's) to the highest bidder.

We also agree with the Bankruptcy Court that Green Tech was *authorized* to consent to the Trustee's sale of Green Tech's interest in the Property. *See* § 363(f) ("The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of *an entity other than the estate* [ ] if . . . such entity consents." (emphasis added)). As part of the Compromise, Green Tech gave the Trustee a power of attorney to sell its legal interest in the Property. *See* Settlement Agreement and Release at 5 ("Green Tech, as necessary and appropriate, shall execute a special power of attorney in favor of the Trustee *to act on behalf of Green Tech* with respect to the sale of the [ ] Property." (emphasis added)). In their Objections, the Appellants maintain that, "because the Trustee was appointed to execute a deed on behalf of" Green Tech, "the Trustee was not selling the estate's interest and the interest of 'an entity other than the estate.'" Initial Br. at 9. But that's absurd. A power of attorney authorizes one party to speak for another in official documents. *See Power of Attorney*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[P]ower of attorney (18c) 1. An instrument granting someone authority to act as agent or attorney-in-fact for the grantor."). It doesn't transfer ownership

from one party to the other. So, in addition to selling the estate's interest, the Trustee *was* also selling the "interest . . . of an entity other than the estate"—*i.e.*, Green Tech's.

The rest of the Appellants' § 363 objections turn on subsections of § 363 that the Property Sale did *not* involve. *First*, the Appellants claim that the sale didn't satisfy the conditions of § 363(h). *See* Initial Br. at 9 ("[Section] 363(h) defines the types of co-ownership which may bring the interest of a non-debtor within the control of a trustee, but none of those enumerated forms of co-ownership define the relationship between an owner of record and a party asserting an equitable interest."). But that subsection is triggered only when a trustee sells "an undivided interest" the debtor shares with another entity "as a tenant in common, joint tenant, or tenant in the entirety." § 363(h). Our Trustee, of course, wasn't selling any such interest—principally because no one has ever suggested that the estate and Green Tech own "an undivided interest" in the Property as tenants in common, joint tenants, or tenants by the entirety. A "tenancy in common" is a "tenancy by two or more persons, in equal or unequal undivided shares, each person having an equal right to possess the whole property but no right of survivorship." *Tenancy*, BLACK'S LAW DICTIONARY (11th ed. 2019). Since Green Tech owns the Property outright in fee simple—and given that the estate only holds a contingent interest in the Property through its purchase option—the estate and Green Tech *don't* have "an equal right to possess the whole property." A "joint tenancy," by contrast, is a "tenancy with two or more coowners who are not spouses on the date of acquisition and have identical interests in a property with the same right of possession." *Ibid.* Since (as we've established) the estate's and Green Tech's interests in the Property are not identical—and because the estate has no right of possession over the Property—the estate and Green Tech don't own the Property through a joint tenancy. Finally, a "tenancy by the entirety" is a "common-law estate in which each spouse is seised of the whole of the property. . . . A joint tenancy can exist with any number of persons, while an estate by entirety can be held only by a husband and wife and is not available to any other persons. And it can be acquired only during the

15

marriage." *Ibid.* Because Green Tech and the estate aren't married, they cannot own the Property through a tenancy by the entirety. In short, Green Tech and the estate *don't* own an "undivided interest" in the Property as joint tenants, tenants in common, or tenants by the entirety, so § 363(h) doesn't govern us here. In any event, the Trustee didn't *need* to look to § 363(h) for permission to sell the Property because, as we've explained, the Compromise separately satisfied the requirements of § 363(f). *See* § 363(f)(2) ("The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if . . . (2) such entity *consents*[.]" (emphasis added)). And we'd only have to rely on the provisions of § 363(h) if the requirements of § 363(f) had *not* been met. *See* § 363(h) ("Notwithstanding subsection (f) of this section, . . . .").[9]

*Second*, the Appellants contend that "[Section] 363(j) would require the Trustee to distribute to [Green Tech] the value of its interest in the subject property"—and (they add) this "provision [was] not included in the Motion." Initial Br. at 9. But § 363(j) only limits the "sale of property [under] subsection (g) or (h)," § 363(j)—neither of which apply here. We've already explained why § 363(h) is inapplicable—because the estate isn't sharing "an undivided interest" with *anyone* "as a tenant in common, joint tenant, or tenant in the entirety." And § 363(g) is likewise inapposite because it applies only to debtors who sell their interests "free and clear of any vested or contingent right in the nature of a dower or curtesy." "The term 'dower' generally refers to the interest a widow takes in the estate of her deceased husband. . . . Curtesy is the corresponding right of the husband by which he is entitled, on the death of his wife, to a life estate in [certain property.]" *Est. of Johnson v. C.I.R.*, 718 F.2d 1303,

---

[9] We, for similar reasons, reject the Appellants' contention that the Compromise ignored some salient aspect of § 363(i). *See* Initial Br. at 9 ("363(i) would entitle [Green Tech] to purchase the property, but that was not included in the Motion."). That Section—like § 363(j)—only applies to "the consummation of a sale of property to which subsection (g) or (h) of this section applies, or of property of the estate that was community property of the debtor and the debtor's spouse immediately before the commencement of the case[.]"

1307 n.9 (5th Cir. 1983). The Appellants never suggest that this case involves some interest the estate *had* to sell "free and clear of any vested or contingent right in the nature of a dower or curtesy." Indeed, § 363(j)'s reference to § 363(g) makes clear that the latter only applies when a trustee is selling the joint property of current or former *spouses*. *See* § 363(j) ("After a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute *to the debtor's spouse* or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of *such spouse* or co-owners, and of the estate." (emphases added)). At first glance, the term "or the co-owners" might seem to apply to the relationship between the estate and Green Tech. But a closer inspection of § 363(j) reveals that it's referring here to the two kinds of ownership outlined in the two subsections it cross-references: (g) and (h). Since the latter governs cases involving a "co-owner in property," § 363(h), and the former applies to spousal interests ("dower or curtesy," § 363(g)), the reference to "spouse or co-owners" in § 363(j) is (we think) just a reference to the spousal and co-ownership relationships identified in §§ 363(g) & (h), respectively. And we've already found that those two types of relationships are irrelevant here—mainly because the estate and Green Tech *weren't* spouses (§ 363(g)) and *didn't* own "an undivided interest" in the Property "as a tenant in common, joint tenant, or tenant in the entirety" (§ 363(h)).

*Third*, the Appellants appear to suggest that the Compromise violated the rights of *another* creditor (Pet star Corporation) to bid on the Property under § 363(k). *See* Initial Br. at 9 ("363(k) would entitle Pet Star to credit bid its mortgage, another provision of the Code overlooked in the Motion."). But our Appellants lack standing to assert claims on Pet star's behalf. *See In re Bay Circle Props., LLC*, 955 F.3d 874, 879 (11th Cir. 2020) (noting that the "person aggrieved doctrine" limits "the right to appeal a bankruptcy court order to . . . those whom [it] directly, adversely, and pecuniarily affects by

diminishing their property, increasing their burdens, or impairing their rights" (cleaned up)).[10] In any event, the record is clear that Pet Star *supported* the Compromise. *See* Aug. 17 Hr'g Tr. at 46:3–6 ("Mr. Kelly: . . . I'm appearing here just to vocalize Petstar Corporation's support for the trustee's motion and settlement.").[11]

There is, therefore, no support for the Appellants' contention that the Property Sale violated any part of § 363.

## II.     The Compromise does not violate the Code's priority scheme

The Appellants maintain that "[t]he approved distribution of proceeds directly contradicts the statutorily prescribed priorities of distribution in 11 U.S.C. §§ 507, 726," Initial Br. at 6, but they never explain *why* they think so. Here (again), then, they've forfeited any such argument. *See Campbell*, 26 F.4th at 873; *Hamilton*, 680 F.3d at 1319; *In re Egidi*, 571 F.3d at 1163; *Sapuppo*, 739 F.3d at 681. In any event, our independent review of the record confirms that the Compromise *doesn't* violate the Bankruptcy Code's priority scheme.

The Code "sets forth a basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate." *Jevic Holding Corp.*, 580 U.S. at 457. As relevant here, "[s]ecured creditors are highest on the priority list," followed by "[s]pecial classes of creditors,"

---

[10] The Appellants never even imply that *they* were harmed by this (supposed) violation of Pet star's rights. Nor (it goes without saying) have they explained *how* they might have been harmed by that violation.

[11] To the extent the Appellants are claiming that the Compromise is inadequate because it would allow the mortgage holder (Pet Star) to credit bid the value of its mortgage against the sale price of the Property, we don't think it's done enough—in this cryptic, citation-less sentence—to preserve this position. *See Sapuppo*, 739 F.3d at 681 (collecting cases for the proposition that "an appellant [forfeits] a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority"). In any case, Pet Star has never been interested in buying the Property, so this concern—to the extent it is one—is really neither here nor there. *See* Aug. 17 Hr'g Tr. at 32:17–33:7 (Mr. Malnik, the Trustee's lawyer, explaining that he and Mr. Kelly, Pet Star's lawyer, were very close to an agreement on the amount the estate would pay to Pet Star, in exchange for a release of Pet Star's secured claim, *after* the Property is sold to someone else).

which must be paid in the order set out first in § 507, then in § 726. *Ibid.*; *see also* 11 U.S.C. § 726(a) (requiring that "property of the estate [ ] be distributed . . . first, in payment of claims of the kind specified in, and in the order specified in, section 507"). Among these "special classes of creditors" are those holding "administrative expenses." 11 U.S.C. § 507(a)(2). Next in line are holders of various types of unsecured claims. *See* 11 U.S.C. § 507(a)(2)–(8).

Given the Bankruptcy Court's last-minute emendation, we see no priority issues with the Compromise.[12] Under the Compromise's terms, Green Tech would receive a $2,500,000 "allowed" *general unsecured claim* in exchange for, among other things, a release of all its claims (and potential claims) against the estate. *See* Settlement Agreement and Release at 56 ("In consideration of the general terms of settlement . . . Green Tech shall be granted an allowed, non-priority general unsecured claim (as established by 11 U.S.C. § 726(a)(2)) in the amount of $2,500,000.00."). And at least two of the claims Green Tech waived—a secured claim on the Cash Bond and a (potential) administrative-expenses claim—were entitled to a *higher priority* than the general unsecured claim it received through the Compromise. *See* Aug. 17 Hr'g Tr. at 121:18–122:9 (the court noting that Green Tech was giving consideration for the $2,500,000 general unsecured claim and that "[o]ne aspect of that consideration is the agreement by Green Tech to subordinate [its current and potential claims]"); *see also Jevic Holding Corp.*, 580 U.S. at 457 (noting that secured claims are "highest on the priority list"); 11 U.S.C. § 726 (listing unsecured claims as subject to payment only after claims listed in § 507, like administrative-expense claims, are satisfied).

True, Green Tech's "allowed" $2,500,000 claim would then be reduced, dollar for dollar, by the portion of the sale proceeds Green Tech received for its legal interest in the Property. *See* Settlement Agreement and Release at 56 ("[T]he Green Tech [allowed $2,500,000 claim] shall be

---

[12] Because the court severed the Litigation Sharing Provision from the Compromise, that provision is not at issue here.

reduced dollar for dollar by all sums paid (or to be paid) to Green Tech as [ ] Green Tech Sale Proceeds."); *see also id.* at 54 (defining Green Tech Sale Proceeds as the net proceeds from the sale of the Property "received by Green Tech pursuant to [the sale-proceeds-sharing formula]"). And, in their brief, the Appellants challenge—albeit in very cursory fashion—Green Tech's right to this dollar-for-dollar reimbursement *over and above* other creditors. *See* Initial Br. at 6 (contending that "[t]he approved distribution of proceeds directly contradicts the statutorily prescribed priorities of distribution in 11 U.S.C. §§ 507, 726"). But, remember, these payments to Green Tech would be remuneration for *Green Tech's* interest in the Property, *not* the estate's. Because the priority rules in §§ 507 & 726 apply only to the distribution of *estate* assets, any payment to Green Tech for the value of its *own* separate assets falls outside the scope of these priority rules. *See Jevic Holding Corp.*, 580 U.S. at 457 (noting that the Code "sets forth a basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the *estate*" (emphasis added)); *see also* 11 U.S.C. § 726(a) (setting forth the rules by which the "property of the *estate* shall be distributed" (emphasis added)). As the Bankruptcy Court correctly explained:

> Green Tech holds title to the Property in fee simple and is getting paid based on its direct interest in the Property upon its sale. The Proposed Settlement does not contemplate the transfer of Green Tech's interest to the [e]state prior to the sale, thereby making the proceeds resulting from the sale of Green Tech's fee interest property of the [e]state. . . . The Proposed Settlement merely provides that Green Tech and the [e]state will sell their respective interests on the Property together and each will receive agreed upon amounts based on those separate interests. In short, Green Tech's fee simple interest in the Property is not property of the estate, and the sale proceeds it receives on account of its interest are not subject to § 726. As a result, Green Tech can be paid directly from the sale of the Property as contemplated under the Proposed Settlement without implicating the distribution scheme under § 726 as long as the Proposed Settlement otherwise complies with Rule 9019.

Mem. Op. at 88–89.

The Appellants haven't even tried to undermine this reasoning. Because the Compromise allows Green Tech to recover some of the proceeds of the Property Sale as compensation for Green

Tech's independent interest in the Property, we don't think the settlement violates the Bankruptcy Code's priority scheme.

### III. The Bankruptcy Court didn't need to hold an evidentiary hearing, allow more discovery, or fully assess the merits of Green Tech's potential claim before approving the Compromise

To approve a settlement, a bankruptcy court need only provide "notice and a hearing," FED. R. BANKR. P. 9019(a), and "determine that the settlement does not fall below the lowest point in the range of reasonableness," *In re Kenny*, 2022 WL 2282843, at *3 (quoting *In re Martin*, 490 F.3d at 1275). And, as we've explained, "[i]n evaluating a settlement proposal, a bankruptcy court need not find facts, draw legal conclusions, or otherwise adjudicate the merits of underlying litigation." *Id.* at *5. The Bankruptcy Court satisfied these minimal requirements here.

The 117-page transcript of the Settlement Approval Hearing—and the Memorandum Opinion that followed—make one thing abundantly clear: Before deciding that the Compromise was reasonable, the Bankruptcy Court thoroughly considered (and properly applied) the four *Justice Oaks* factors. *See* Aug. 17 Hr'g Tr. at 135:18–21 ("The Court: . . . . [after discussing the *Justice Oaks* factors)] Again, I'm sorry I took so long, but there was a lot at stake here, and quite a few issues, and I wanted to try to get to a bottom[-]line resolution, which I think we were able to do."); *see also* Mem. Op. at 89–97 (analyzing the *Justice Oaks* factors).

Starting with the first factor—the "probability of success"—the court noted that the Trustee (litigating on behalf of the estate) was "not reasonably likely" to win the Property Dispute. Mem. Op. at 90. And that seems right. As the court explained, "to prevail in a suit for specific performance, Florida law requires that [the Trustee] also establish that she is ready, willing, and able to perform under the contract." *Ibid.* This was a problem (the court pointed out) because the estate "lack[ed] the funds" to buy the Property—making it very unlikely that the estate could prove it was "able to perform under the contract." *Ibid.* And the record plainly supports the Bankruptcy Court's assessment of the

estate's finances (and the likelihood that the estate would be able to buy the Property outright). *See, e.g.*, Aug. 17 Hr'g Tr. at 43:6–12 ("Mr. Malnik: . . . [T]he pure economic thing is, the estate is administratively insolvent. It does not have the funds to pay the option exercise price. So it would have to assign the option contract, which will certainly have to be done at a pretty steep discount, because someone would be stepping into a very uncertain position as to how they could exercise it."); *id.* at 118:22–25 ("The Court: . . . . Though the trustee might be able to monetize the option, the mere fact that the estate is not presently capable of executing under the option on its face further reduces the likelihood of success in the litigation."). We thus agree with the court's view of this first *Justice Oaks* factor.

Turning to the second factor—"difficulties in collection"—the court correctly recognized that "collection is not necessarily an issue" because "the Property Dispute seeks specific performance." Mem. Op. at 90. We could probably stop here. But (the court also explained) the estate was going to have a problem "collecting" any value from its option. To prevail on its specific-performance claim to enforce its purported option, after all, the estate would have to show that it was "ready, willing, and able" to close, even though it didn't actually have the funds to do so. *See* Aug. 17 Hr'g Tr. at 99. The estate would therefore be in the difficult position of having to "assign the purported option before it even proves the option exists." Mem. Op. at 91. Who (in the open market) would be willing to pay any real money for *that*?

Here, again, we agree with the Bankruptcy Court. "A bankruptcy court abuses its discretion when it either misapplies the law or bases its decision on factual findings that are clearly erroneous." *In re Gaddy*, 851 F. App'x at 999. And "[a] factual finding is not clearly erroneous unless, after reviewing all of the evidence, we are left with a definite and firm conviction that a mistake has been committed." *Ibid.* (cleaned up). Nothing in the record suggests that the Bankruptcy Court erred when it, consistent with the Trustee's business judgment, found that the estate was better off selling the Property. *See In*

*re Morgan*, 439 F. App'x 795, 795 (11th Cir. 2011) ("The bankruptcy court approved the settlement because it was the Trustee's best business judgment that the settlement be approved. We find no basis in the record for questioning the Trustee's judgment."). The only person, in fact, who seemed interested in buying the option was Smith. But, while his "[c]ounterproposal [would] give[ ] the [e]state $200,000.00," that payment came with significant strings attached—specifically, it was "in exchange for significant consideration, including—but well beyond—a transfer of the purported option." Mem. Op. at 91. And our Appellants, as the Bankruptcy Court highlighted, have failed to "put forth any legal or factual basis to conclude that selling the purported option and allowing another entity to continue the litigation is a superior alternative to the Proposed Settlement with Green Tech." *Ibid.* Indeed, if the estate receives the $300,000 (or more) the Trustee estimated it would clear from the sale of the Property, the Compromise would net the estate *at least* $482,000 (from the Cash Bond and the sale of the Property) and would allow the estate the right to recover (if it could) *even more money* from the Insider Litigation.[13] That's far more lucrative than the Appellants' $200,000 purchase offer— which would have required the estate to *forego* any profits it would otherwise have been entitled to from (1) the sale of the Property, (2) the return of the Cash Bond, and (3) its interest in the Insider Litigation.[14]

As for the third factor ("complexity"), the court found that litigating the Property Dispute "would likely require significant time, effort, and administrative expense," that any trial victory "would almost certainly be mired by a years[-]long appellate process," and that, even putting all this aside, "the Trustee would have to find the funds to exercise the option." Mem. Op. at 91. "Settling [the Property Dispute] on the terms proposed," the court therefore concluded, "[wa]s more than reasonable." *Ibid.*

---

[13] We'll explain how the court arrived at these figures in a moment.
[14] Plus, as we'll explain, even under a *worst-case* scenario, the total value of the Compromise is likely to exceed the Appellants' $200,000 cash offer.

Again, none of this strikes us as an abuse of discretion. *See In re Gaddy*, 851 F. App'x at 999 (ruling that the bankruptcy court did not abuse its discretion in approving a compromise partly because "litigating the . . . claims would delay closing the estate for several more years" and "would be costly to the estate"); *In re Morgan*, 439 F. App'x at 795 ("The bankruptcy court approved the settlement because it was the Trustee's best business judgment that the settlement be approved. We find no basis in the record for questioning the Trustee's judgment.").

Finally, on the fourth factor (the "best interest of the creditors"), the court had little trouble concluding that the estate's creditors would do better under the Compromise than they would under the Appellants' counterproposal. After creating a chart that compared the salient features of both proposals, the court acknowledged that the Appellants' counterproposal would leave the estate with $200,000. *See* Aug. 17 Hr'g Tr. at 121:1–2 ("The Court: . . . . [T]he counterproposal is $200,000 in cash."); Mem. Op. at 96–97 (outlining the various aspects of each proposal). The Compromise's *worst-case* scenario, by contrast, would leave the estate with the balance of the Cash Bond (some $182,000). *See* Aug. 17 Hr'g Tr. at 123:13–18 ("The Court: . . . . Even if the trustee and Green Tech are unsuccessful in marketing a sale of the property, and the trustee is unable to recover any fraudulent and avoidable transfers, again, the estate only receives $20,000 more under the counterproposal, and that, again, assumes everything goes wrong."). But the court found this worst-case scenario rather unlikely—mainly because (1) the estate's distribution from the Property Sale would likely "exceed[ ] $300,000" based on the minimum sale price, and (2) the lawsuits against the insiders had the potential for a "significant" recovery. Mem. Op. at 97. There was thus "no clear basis for the [c]ourt to supplant its business judgment for the Trustee's, especially where the Counterproposal at its best is only marginally better than the worst-case scenario of the Proposed Settlement." *Ibid.*

For several reasons, we agree with the Bankruptcy Court's conclusion on this fourth factor too. The Compromise, as the court recognized, "provides the opportunity for the sale of the property

from which the estate will receive substantial proceeds far in excess of that $20,000 [difference between Smith's $200,000 offer and the worst-case scenario under the Compromise ($182,000)], and again, provides for the potential of the trustee pursuing the litigation claims [against insiders] and recovering even more money." Aug. 17 Hr'g Tr. at 123:19–24. The Compromise also averted a potential "mid-six figures [ ] administrative expense claim" and a "substantial contribution claim" from Green Tech, *see id.* at 35:21–36:6, along with any additional attorneys' fees the estate would've had to pay in its litigation against Green Tech, *see id.* at 120:16–18 ("The Court: . . . . [The Compromise] minimizes or eliminates further professional fees and costs associated with further litigation with Green Tech."). Even in a worst-case scenario, then, the Compromise (very likely) comes out on top. Here too, therefore, the Bankruptcy Court *reasonably* deferred to the Trustee's business judgment.

Against all this, the Appellants advance five arguments—all unavailing. *First*, they say that the Bankruptcy Court should have approved their counterproposal because it was a "simpler alternative" that "provided for payment of all legitimate non-insider creditors." Initial Br. at 11. But, as we've outlined, the Bankruptcy Court *did* carefully weigh the competing deals' relative "complexity" when it addressed the third *Justice Oaks* factor. *See* Mem. Op. at 91. But, even if it hadn't, that omission (standing alone) wouldn't qualify as an abuse of discretion. *See In re Chira*, 567 F.3d at 1313 (affirming the approval of a compromise even though "[t]he bankruptcy court did not consider the second and third *Justice Oaks* factors—collection difficulties for the Trustee and the complexity, expense, inconvenience, and delay of the potential litigation [ ]—in any meaningful way"). In any event, the counterproposal *didn't* guarantee the estate's creditors *more* than they would've received under the Compromise: The counterproposal, as we've shown, would net the estate only a $200,000 "flat" payment—without any of the added revenues from the Insider Litigation, the Cash Bond, or the Property Sale (all of which *are* available under the Compromise). *See* Mem. Op. at 96–97 (setting zero as the potential recovery under the Appellants' counterproposal for *both* the "Property Sale" *and* the

"Proceeds from Actions Against Insiders & Affiliates"). As the Bankruptcy Court's chart made clear, when we compare anything above the Compromise's worst-case scenario, the Compromise far outpaces the Appellants' proposal in value (by hundreds of thousands of dollars, in fact). *See ibid.* And that's because, between the Cash Bond and the estate's share of the Property Sale, the Compromise would net the estate at least $482,000, plus the "possibly significant" recovery from the Insider Litigation, *see id.* at 97—far more than the $200,000 "ceiling" of the counterproposal. And, as we've seen, even though the counterproposal would have netted the estate $18,000 more than the Compromise's *worst* case—an extremely unlikely result given that the counterproposal left the estate open to an administrative claim from Green Tech, for which the defense fees alone might exceed $18,000—that minimal extra cash would have required the estate to forego its (potentially lucrative) interest in *both* the Property Sale *and* the Insider Litigation. *See ibid.* Whether the counterproposal is simpler or not, in short, we cannot agree that the Bankruptcy Court erred in siding with the Compromise.

*Second*, the Appellants maintain that the Bankruptcy Court should have held an *evidentiary* hearing. *See* Initial Br. at 10 ("The Bankruptcy Court erred in approving the [Compromise] without holding an evidentiary hearing."). But the Bankruptcy Court *did* hold a final approval hearing—and nothing in Rule 9019 requires anything more. That rule provides, in pertinent part, as follows: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). The rule thus unambiguously requires bankruptcy courts to hold a hearing—but it *doesn't* set out any evidentiary requirements for that hearing. As the Supreme Court has said many times, when a rule's "language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989); *see also* A. SCALIA AND B. GARNER: THE INTERPRETATION OF LEGAL TEXTS 93 (2012) ("Nothing is to be added to what the text states or reasonably implies (*casus omissus pro omisso habendus est*). That is, a matter not

covered is to be treated as not covered.'"). And we're not alone in reading the rule this way. As the Seventh Circuit has explained: "It is clear that Rule 9019(a) itself does not expressly obligate the court to hold an evidentiary hearing prior to approving a compromise under Rule 9019(a)." *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994). This, by the way, is also the view of the Third Circuit—the only other court of appeals to have commented on this question. *See In re ID Liquidation One, LLC*, 555 F. App'x 202, 207 (3rd Cir. 2014) ("The Bankruptcy Court was not required to have an evidentiary hearing on the merits of all claims before approving the Settlement[.]"). The Bankruptcy Court thus didn't err by declining to hold an *evidentiary* hearing.

   *Third*, the Appellants claim that the "terms of [the] [C]ompromise were not fully disclosed" and should have been included "in the notice to interested parties." Initial Br. at 10. But the only term they actually identify as having been omitted is an alleged "transfer of the Debtor's tax attributes to [Green Tech]," which (the Appellants say) was "a major consideration, neither included in the Motion, nor quantified at the hearing." *Ibid.*[15] The Appellants raised something of a similar objection below—which the Bankruptcy Court rejected, noting that they "appear to be laboring under the misconception that, under the Proposed Settlement, the estate would be responsible for 100% of the tax burden from the sale of the Property," but have, once again, "presented no explanation for why that might be the case." Mem. Op. at 83 n.10. In any case, the Bankruptcy Court *did* (contra the Appellants' contentions) hear about the tax implications of the settlement at the approval hearing. *See* Aug. 17 Hr'g Tr. at 44:16–21 (the Trustee testifying that, "contrary to the claims in the objection, the trustee has retained Soneet Kapila's office, which has done a detailed tax analysis of the settlement" and which has concluded that

---

[15] We're having some difficulty understanding what *exactly* the Appellants are saying here. To the extent they're raising a procedural-due-process claim, though, they've plainly forfeited that objection by never raising it before the Bankruptcy Court. *See In re Lett*, 632 F.3d 1216, 1229 (11th Cir. 2011) ("If the record reflects an issue was presented in a cursory manner and never properly presented to the Bankruptcy Court, the issue is not preserved for appeal." (cleaned up)).

"the estate [has] a potential low to mid-five figure exposure on taxes with respect to this deal"). And (it goes without saying) the Appellants have done *nothing*—neither here nor before the Bankruptcy Court—to call this tax opinion into question. We, in short, agree with the Bankruptcy Court's assessment of this issue: "In the absence of any explanation by the [Appellants] supporting th[eir] [tax-treatment] assumption," the court said, "the Court sees no legitimate challenge to the Trustee's business judgment in this regard." Mem. Op. at 83 n.10.

*Fourth*, the Appellants insist that the Bankruptcy Court erred by not "permitting discovery to be completed prior to closing the hearing." Initial Br. at 10. Again, however, they cite no legal authority for this objection, *see id.* at 10–11; Reply Br. at 1–2—which is reason enough for us to overrule it, *see Campbell*, 26 F.4th at 873; *Hamilton*, 680 F.3d at 1319; *In re Egidi*, 571 F.3d at 1163. In any event, the Eleventh Circuit has made clear that bankruptcy courts need not allow full discovery before approving a compromise. *See In re Gaddy*, 851 F. App'x at 1003 ("[The bankruptcy court] was not required to order full discovery on the merits [of a claim that was settled]."). Take, for instance, *In re Gaddy*, where a Chapter 7 trustee and the debtor's founder submitted to the bankruptcy court a proposed compromise to "release [ ] fraudulent transfer claims against the estate for a 'premium' of $825,000." *Id.* at 999. A creditor objected to the proposed compromise, arguing (among other things) that "it had a high probability of success on the merits of the fraudulent transfer claims in the district court proceeding" and that "more discovery was necessary to evaluate the Trustee's propos[al]." *Ibid.* (cleaned up). After a hearing, the bankruptcy court "issued an order approving the compromise." *Ibid.* On appeal, the creditor argued that "the bankruptcy court should not have approved the compromise without permitting [the creditor] to take discovery related to the proposed compromise." *Id.* at 999–1000. Rejecting this argument, the Eleventh Circuit noted that "[n]othing in Rule 9019(a) or *Justice Oaks* suggests that the bankruptcy court must order the Trustee or debtor to submit to full discovery so that a creditor can be assured of the reasonableness of the proposed compromise." *Id.* at 1003. The

court also reiterated that "the role of the bankruptcy judge is not to decide the numerous questions of law and fact raised by appellants but rather to canvass the issue and see whether the settlement falls below the lowest point in the range of reasonableness." *Ibid.*

The Bankruptcy Court admirably carried out this baseline canvassing function here. And nothing in Rule 9019 required the court, before approving the Compromise, to allow extra (and costly) discovery.[16] *See* FED. R. BANKR. P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."). Indeed, such a requirement "would defeat the purpose of a compromise because, after full discovery, the parties might as well go ahead and try the case." *In re Gaddy*, 851 F. App'x at 1003.

*Fifth*, the Appellants contend that the administrative-expenses statute (11 U.S.C. § 503(b)(3)(D)) required the Bankruptcy Court to hold a hearing to determine the validity of Green Tech's potential administrative-expense and substantial-contribution claims. *See* Initial Br. at 8 ("The approved enhancement of the claim of [Green Tech] is purportedly due to the contributions which [it] made to the case, and waivers of unclaimed administrative expenses, yet is granted in the absence of compliance with 11 U.S.C. § 503(b)(3)(D)."). And § 503(b)(3)(D) does say that, "*[a]fter notice and a hearing*, there shall be allowed administrative expenses, . . . including the actual, necessary expenses . . . incurred by . . . a creditor . . . in making a substantial contribution in a case under chapter 9 or 11 of this title[.]" § 503(b)(3)(D) (emphasis added). But Green Tech was "allowed" no such claims in this case. It, on the contrary, *waived* its right to seek these claims as a part of the Compromise. *See, e.g.*, Aug. 17 Hr'g Tr. at 36:4–6 ("Mr. Malnik: . . . . [W]e're talking a potentially very sizable mid-six figures claim,

---

[16] We say "extra" because (while the Appellants never mention it) the parties *did* engage in some discovery below. The record reflects, for instance, that No Rust sought and obtained documents and testimony from the Chapter 7 Trustee *before* the final approval hearing. *See* Notice of Filing Transcript of 2004/7030 Examination of Sonya Salkin Slott [Bankr. ECF No. 247] at 5 ("[Mr. Gleason, counsel for No Rust]: Thank you, and I appreciate the 797 pages of production in advancement [sic].").

administrative expense claim that Green Tech is waiving as part of this settlement."). Section 503(b)(3)(D) is thus neither here nor there.

To the extent the Appellants are here suggesting that the Bankruptcy Court should have conducted a hearing to calculate the *exact* amount of the administrative-expense claim Green Tech was waiving, we see four problems with this argument. *One*, the Appellants never actually advance this argument explicitly, and it's not our job to make arguments for them. *See Campbell*, 26 F.4th at 873; *Hamilton*, 680 F.3d at 1319; *In re Egidi*, 571 F.3d at 1163; *Sapuppo*, 739 F.3d at 681. *Two*, by its own terms, § 503(b)(3)(D) only requires a hearing when the administrative-expense claim is "allowed." Since Green Tech waived any such claim as part of the Compromise, § 503(b)(3)(D) is inapposite here. *Three*, Mr. Malnik *did* tell the court that Green Tech's administrative-expense claim was "sizable" and in the "mid-six figures[.]" Aug. 17 Hr'g Tr. at 36:4–6. And, in approving a settlement of these various claims, the Bankruptcy Court was entitled to take him at his word. *See In re Gaddy*, 851 F. App'x at 1003 ("[T]he role of the bankruptcy judge is not to decide the numerous questions of law and fact raised by appellants but rather to canvass the issue and see whether the settlement falls below the lowest point in the range of reasonableness."). *Four*, even if the administrative-expense claim was ultimately meritless, the Compromise was still a better deal than the counterproposal because, as we've shown, it (1) allowed the estate to profit from the Sale of the Property, (2) entitled the estate to whatever remains of the Cash Bond, (3) permitted the estate to recover extra money from the Insider Litigation, and (4) saved the estate all the attorneys' fees it would've had to pay in defending against Green Tech's claims (however viable those claims ultimately turned out to be).

\* \* \*

For all these reasons, then, we hereby **ORDER AND ADJUDGE** that the Bankruptcy Court's Order Granting Trustee Sonya S. Slott's Motion to Approve Stipulation to Compromise [Bankr. ECF No. 257] is **AFFIRMED**.

**DONE AND ORDERED** in the Southern District of Florida on July 20, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record